46 A.3d 473

LONG GREEN VALLEY ASSOCIATION, et al.

v.

BELLEVALE FARMS, INC., et al.

No. 0228, Sept. Term, 2009.

Court of Special Appeals of Maryland.

June 8, 2012.

638

640

Michael R. McCann, Towson, MD, for Appellant.

Thomas F. Filbert, Annapolis, MD, & John B. Gontrum, Towson, MD (Craig A. Nielsen, Douglas F. Gansler, Atty. Gen., Annapolis, MD, & Jennifer R. Lazenby, Whiteford, Taylor & Preston, LLP, Towson, MD), on the briefs, for Appellee.

Panel: MEREDITH, ZARNOCH, and JAMES A. KENNEY III, (Retired, Specially Assigned), JJ.

KENNEY, J.

Appellants Long Green Valley Association ("LGVA") and John and Susan Yoder ("the Yoders") appeal the issuance of a declaratory judgment by the Circuit Court for Baltimore County in favor of appellees: Bellevale Farms, Inc., Bellevale Farms Limited Partnership, Prigel Family Creamery, Inc., and Robert E. and Carol A. Prigel (collectively, "Bellevale"), and the Maryland Agricultural Land Preservation Foundation ("MALPF").[1] Appellants present one question, which we have reworded slightly:

> Did the circuit court err in concluding that appellants lack standing to bring an action challenging Bellevale's proposed

---

1. "Appellees" shall refer to both Bellevale and MALPF, and "appellants" shall refer to both LGVA and the Yoders.

construction and operation of a creamery in violation of an agricultural preservation easement held by MALPF?

For the reasons that follow, we shall vacate the judgment and remand to the circuit court for further proceedings.

## FACTS AND PROCEEDINGS [2]

Bellevale owns and operates a dairy farm ("Bellevale Farm") on approximately 199 acres located at 4851–53 Long Green Road in the Long Green Valley area of Baltimore County. The Yoders own and operate an adjacent dairy farm.

MALPF is an entity of the Maryland Department of Agriculture. *See* MD. CODE ANN., AGRIC., § 2–502. Section 2–501 of the Agriculture article [3] provides,

(a) *In general.*—It is the intent of the Maryland General Assembly to preserve agricultural land and woodland in order to:

(1) Provide sources of agricultural products within the State for the citizens of the State;

(2) Control the urban expansion which is consuming the agricultural land and woodland of the State;

(3) Curb the spread of urban blight and deterioration; and

(4) Protect agricultural land and woodland as open-space land.

To carry out that intent, MALPF is granted the power to (1) "enter into contracts generally and to execute all instruments necessary or appropriate to carry out its purposes," and (2) to "acquire, by gift, purchase, devise, bequest or grant, easements in gross or other rights to restrict the use of agricultural land and woodland as may be designated to maintain the

---

2. The facts as set out are based on the assertions by the parties in the pleadings and affidavits filed in this case.

3. Subtitle 5 of title 2 of the Agriculture article relates to the "Maryland Agricultural Land Preservation Foundation."

character of the land as agricultural land or woodland[.]" *Id.* at § 2–504(2)–(3). Under the statute,

(1) A landowner whose land is subject to an easement may not use the land for any commercial, industrial, or residential purpose *except:*

(i) As determined by the Foundation, for farm- and forest-related uses and home occupations; or

(ii) As otherwise provided under this section.

*Id.* at § 2–513 (emphasis added).

LGVA is "a community association representing approximately 300 residents of the Long Green Valley of Baltimore County, and is dedicated to the preservation of open space, farmland, natural resources, historic sites, and the heritage and character of the Long Green Valley." The Yoders are members of LGVA.

As described in the affidavit of LGVA's secretary,

Over the years, the LGVA has solicited landowners in the Long Green Valley to sell or donate easements on their properties to MALPF, Baltimore County's Agricultural Land Preservation and Rural Legacy programs, the Long Green Conservatory, and other conservancies and trusts. Members of LGVA, [including the Yoders,] in fact, have placed their properties in conservation easements, including MALPF easements. The LGVA has contributed funds towards the purchase of at leas[t] one easement.

On January 12, 1997, the State, on behalf of MALPF, purchased an "agricultural preservation easement" on Bellevale Farm for $796,500. Under the deed of easement ("the Easement Agreement"), it is

the intention of the parties that the said land shall be preserved solely for agricultural use in accordance with the provisions of the Agriculture Article, Title 2, Subtitle 5 . . . and that the covenants, conditions, limitations and restrictions hereinafter set forth, are intended to limit the use of the above described land[.]

The section of the Easement Agreement labeled COVE-NANTS, CONDITIONS, LIMITATIONS, and RESTRIC-TIONS states:

[A](1)(a) Except as otherwise provided in this instrument, the above described land may not be used for any commercial, industrial, or residential purpose....

[A](3) The grantor reserves the right to use the above described land for any farm use, and to carry on all normal farming practices ... including any operation directly relating to the processing, storage, or sale of farm, agricultural or woodland products produced on the said above described land....

[B](6) If the Grantor has any doubts concerning the easement, covenants, conditions, limitations or restrictions herein contained with respect to any particular use of the said land, the Grantor may submit a written request to the Grantee for consideration and approval of such use....

[B](9) This easement shall be in perpetuity, or for so long as profitable farming is feasible on the Grantor's land and may be released only by the Grantee as provided by Agriculture Article, Section 2–514[.]

The Easement Agreement also states that it "shall be governed by the laws of the State of Maryland and the parties hereby expressly agree that the courts of the State of Maryland shall have jurisdiction to decide any question arising hereunder after all administrative remedies have been exhausted."

As stated by MALPF's Executive Director,

under the [Easement Agreement], consistent with § 2–513 ... Bellevale [is] prohibited generally from using the land for any commercial, industrial, or residential purpose. There are, however, exceptions to this general prohibition—one notable exception [is] the ability to use the land, as determined by MALPF, for "farm and forestry related uses and home occupations."

On August 1, 2007, Bellevale filed a request with MALPF seeking,

to construct a 7,000 to 10,000 square foot building to house [a] creamery operation, processing facility and a farm store. As well, [Bellevale is] requesting a parking area that would accommodate fewer than 10 vehicles. The parking area is proposed to be located on Long Green Road with the creamery directly behind it. A short distance of access on an existing farm lane may be needed.

According to MALPF's Executive Director,

[o]n October 23, 2007, MALPF, pursuant to its authority under § 2–513(b)(i), reviewed the . . . request and approved the creamery operation, as proposed to the Board, having determined that the operation was a "farm related use" that complements [Bellevale's] organic dairy operation—a use that is compatible with agriculture and MALPF's program. MALPF took this action after being advised that the Baltimore County Agricultural Land Preservation Advisory Board already had reviewed [Bellevale's] request and voted favorably on it.

Appellants submit,

[a]fter MALPF's approval of the Creamery Operation on October 23, 2007, [a]ppellants requested that MALPF reconsider its approval and enforce the terms of the Easement Agreement and State and County law. Appellants also requested that the Secretary of Agriculture intervene. Despite these requests, MALPF and the Secretary have refused to take further action to enforce the Easement Agreement and the law.

On April 4, 2008, in Zoning Case No.2008–0506 ("the Zoning Case"), appellants filed a "Petition for Special Hearing" before the Deputy Zoning Commissioner for Baltimore County in order to determine "whether a dairy processing facility is permitted in an R.C.2 zone[.]" On August 12, 2008, the Deputy Zoning Commissioner found the proposed facility was permitted. Appellants appealed that decision to the Board of Appeals, but later dismissed their appeal.

On May 30, 2008, based on MALPF's approval of the proposed creamery, appellants filed an amended four-count complaint with the Circuit Court for Baltimore County:

- Count I: Writ of Mandamus—MALPF's Failure to Enforce the Easement Agreement
- Count II: Writ of Mandamus—MALPF's Failure to Enforce the Provisions of State and Local Law
- Count III: Declaratory Judgment
- Count IV: Permanent Injunctive Relief

As characterized by appellants, the complaint seeks:

(i) a writ of mandamus ordering MALPF to enforce the terms of the Easement Agreement and provisions of State and County law, (ii) a declaration that the proposed Creamery Operation violates the Easement Agreement, as well as State and County law, because it constitutes a commercial and/or industrial use, and (iii) an order permanently enjoining Bellevale from constructing and operating the Creamery Operation and further violating the Easement Agreement and State and County law.

In response, on June 27, 2008, Bellevale filed a motion to dismiss and/or for summary judgment, averring that appellants "lack standing to bring their equitable claims[.]" After the circuit court issued its Motions Ruling on August 6, 2008, and "HELD [the motion] FOR FURTHER INFORMATION," MALPF filed a motion to dismiss and/or for summary judgment, primarily based on appellants' lack of standing on all counts of the complaint. On October 7, 2008, appellants filed a cross-motion for summary judgment, "request[ing] that the Court find, as a matter of law, that the Creamery Operation is a commercial use that is prohibited by terms of the Easement Agreement."

At the hearing on the motions, the court said,

[I] need to sit down and to make a declaratory judgment on the motion to dismiss, motion for summary judgment, whatever is filed in here, to the effect that this is an issue involving standing ... [and] the legislature has not indicat-

ed one way or another through any historical development or legislative history that I can see, whether or not there should be standing. So that means that we fall back on the issue of whether an easement itself gets standing and they have not said one way or another about that. In fact, they have specifically said that they have appointed somebody in the position called the State of Maryland, the Office of the Attorney General, etcetera to enforce this. Now, the next step is do they as property owners have this right. Well, *Sugarloaf* is very, very interesting because the property owners had that right because they were having a dump there and they were burning all sort of toxic materials and the Butlers and the other people claimed that it was harming their land. So I am not going to say the Court of Appeals is ever going to close the door completely on saying that these adjacent property owners don't have any right. What I'm saying is I can't see that they have anything different as did occur in *Sugarloaf* because their properties were being destroyed or hurt through toxic substances coming over which is not manifest here because I don't see it, except for the desire not to have competition in this regard, I can't see your clients are in any other position here able to be articulated different from the public. . . . I, there's two matters of first impression here, that is the right or not of the public to enforce this easement and, secondly, the situation as to whether or not it's going to be considered a charitable trust.

On March 19, 2009, the circuit court issued its **ORDER OF COURT DECLARATORY JUDGMENT.** It stated:

It is ORDERED and DECLARED by the Circuit Court for Baltimore County that [appellants] have no authority under [subtitle 5 of title 2 of] the Agriculture Article of the Annotated Code of Maryland, . . . Maryland law pertaining to easements[,] or otherwise by any other principle or doctrine of law to challenge through direct primary jurisdiction the right of [Bellevale] to construct a creamery operation on property owned by [Bellevale] as they have alleged in their Complaint. [Appellants] have no standing.

It is the right of [appellants] to carry their dispute with [appellees] through the zoning, planning and permit process of land use enacted by the State of Maryland and Baltimore County as those laws pertain to [Bellevale Farm]. Any citizen who qualifies for standing in the administrative process may initiate that process with Baltimore County government. . . .

For reasons more completely explained by this court on the record at the time of the hearing on the open motions, it is determined by this court that neither the legislative history of the MALPF enactment, the wording of the Statutory scheme or any COMAR regulation enacted pursuant to the statute indicate any intent to allow a taxpayer, an adjoining property owner, or any other individual or entity to challenge the decision made by MALPF to approve the creamery operation by direct application of primary jurisdiction with this court. . . .

As a result of a consideration of the pleadings and papers filed in this case and upon a hearing it is **ORDERED** by the Circuit Court for Baltimore County as follows:

1. [Bellevale's] Motion for Summary Judgment . . . is **GRANTED.**

2. [MALPF's] Motion for Summary Judgment is **GRANTED.**

3. The Motion for Summary Judgment filed by [appellants] . . . is **DENIED.**

Count I (Mandamus for . . . failure by MALPF to enforce an agricultural easement), Count II (Mandamus for an alleged failure by MALPF to enforce provisions of State and Local law), and Count IV (Request for Injunctive Relief) are all dismissed.[4]

---

4. As to the third count, the circuit court issued a declaratory judgment that appellants had no standing to challenge the creamery operation "through direct primary jurisdiction" of the court.

## DISCUSSION

### I. Standard of Review

 The circuit court's order issued a declaratory judgment that appellants lacked standing,[5] granted appellees' motions for summary judgment and also "dismissed" Counts I, II and IV of the complaint.[6]

In *Catalyst Health Solutions, Inc. v. Magill,* 414 Md. 457, 470–72, 995 A.2d 960 (2010), the Court of Appeals explained,

The entry of summary judgment is governed by Rule 2–501, which provides in pertinent part:

(f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

As we recently stated in *Gourdine v. Crews,* 405 Md. 722, 735–36, 955 A.2d 769, 777–78 (2008), the standard of review of a grant of such a motion is as follows:

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condo-*

---

**5.** Standing "should be adjudicated by the circuit court 'through a motion or other appropriate pleading filed . . . to dismiss . . . a party.'" *Sugarloaf Citizens' Ass'n v. Department of Env't,* 344 Md. 271, 292, 686 A.2d 605 (1996) (quoting *Morris v. Howard Research & Development Corp.,* 278 Md. 417, 424–25, 365 A.2d 34 (1976)). "There are . . . occasions when it may be proper for a circuit court to . . . enter judgment against a plaintiff in an action in which no legal remedy would be available," such as when the plaintiff lacks standing. *Howard v. Montgomery Mut. Ins. Co.,* 145 Md.App. 549, 555, 805 A.2d 1167 (2002).

**6.** When a party relies on material outside the pleadings, as the circuit court did here, a motion to dismiss and/or for summary judgment is converted into a motion for summary judgment. *See 120 W. Fayette St., LLLP v. Mayor of Baltimore,* 407 Md. 253, 263, 964 A.2d 662 (2009) ("By relying on material outside of the pleadings when granting the City's motion to dismiss, the Circuit Court, in effect, converted the motion to dismiss·into a motion for summary judgment.").

*minium,* 404 Md. 560, 570–71, 948 A.2d 11, 18 (2008); *Rodriguez v. Clarke,* 400 Md. 39, 926 A.2d 736 (2007); *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party."); *Harford County v. Saks,* 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs."). If no material facts are in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law.

*Anderson,* 404 Md. at 571, 948 A.2d at 18; *Rodriguez,* 400 Md. at 70, 926 A.2d at 754; *Saks,* 399 Md. at 82, 923 A.2d at 6; *Property and Casualty Ins. Guaranty Corp. v. Yanni,* 397 Md. 474, 480–81, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006). On appeal from an order entering summary judgment, we review "only the grounds upon which the trial court relied in granting summary judgment." *Rodriguez,* 400 Md. at 70, 926 A.2d at 754, quoting *Standard Fire,* 395 Md. at 450, 910 A.2d at 1079; *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace,* 366 Md. at 695, 785 A.2d at 729.

The standard of review for a declaratory judgment entered as a result of the grant of a motion for summary judgment is "whether that declaration was correct as a matter of law." *Olde Severna Park Improvement Ass'n, Inc. v. Gunby,* 402 Md. 317, 329, 936 A.2d 365, 371 (2007) (citations omitted). We have held that "[w]hile it is permissible for trial courts to resolve matters of law by summary judgment in declara-

tory judgment actions," *Megonnell v. United Services,* 368 Md. 633, 642, 796 A.2d 758, 764 (2002), the court must, in a separate document and in writing, define the rights and obligations of the parties or the status of the thing in controversy. *Lovell Land Inc. v. State Highway Admin.,* 408 Md. 242, 256, 969 A.2d 284, 292 (2009), citing *Union United Methodist v. Burton,* 404 Md. 542, 550, 948 A.2d 1, 5 (2008), *Allstate v. State Farm,* 363 Md. 106, 117 n. 1, 767 A.2d 831, 837 n. 1 (2001). This requirement is applicable even if the action is not decided in favor of the party seeking the declaratory judgment. *Lovell,* 408 Md. at 256, 969 A.2d at 292, citing *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995).

## II. Standing

As a "threshold issue," *Norman v. Borison,* 192 Md.App. 405, 420, 994 A.2d 1019 (2010), a litigant must have standing "to invoke the judicial process in a particular instance." *Adams v. Manown,* 328 Md. 463, 480, 615 A.2d 611 (1992). Standing rests on "a 'legal interest' such as 'one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" *Committee for Responsible Dev. on 25th St. v. Mayor & City Council,* 137 Md.App. 60, 72, 767 A.2d 906 (2001) (quoting *Baltimore Steam Co. v. Baltimore Gas & Elec. Co.,* 123 Md.App. 1, 15, 716 A.2d 1042 (1998)). "Where there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing." *Board of License Comm'rs v. Haberlin,* 320 Md. 399, 404, 578 A.2d 215 (1990); *see also Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 54, 949 A.2d 639 (2008); *Dorsey v. Bethel A.M.E. Church,* 375 Md. 59, 67 n. 1, 825 A.2d 388 (2003).

As they did in the circuit court, appellants assert three independent, common law bases for standing in this case. First, "they are intended third party beneficiaries" of the Easement Agreement. Second, "the Easement Agreement created a charitable trust, which is enforceable by interested

third parties such as [a]ppellants." Third, "they will be 'specially harmed' by the proposed Creamery Operation in a manner different from the public at large." We shall address each of these arguments in turn.

## A. Third–Party Beneficiary

■ Appellants argue that they are intended third-party beneficiaries of the Easement Agreement and the restrictive covenant as to the use of Bellevale Farm.[7] They state that the Easement Agreement was intended to benefit (1) the general public, (2) other property owners who placed their property in easements, and/or (3) persons who own land adjacent to or nearby Bellevale Farm.

■ In *First United Pentecostal Church v. Seibert*, 22 Md.App. 434, 440, 323 A.2d 668 (1974), we recognized that while "modern courts have refused to be bound by technical rules in determining the right to enforce ... restrictive agreements ... they always have required that the covenant be made with or for the benefit of the party seeking to enforce it." In *Mackubin v. Curtiss–Wright Corp.*, 190 Md. 52, 57 A.2d 318 (1948), the Court of Appeals addressed the rights of third-party beneficiaries to enforce a contract:[8]

The original rule of the common law was that privity between the plaintiff and the defendant is requisite to maintain an action on a contract, even though the contract is for the benefit of a third person. There has been a gradual relaxation of this rule.... The Courts now generally recog-

---

7. The parties characterize the Easement Agreement as a negative easement. "Negative easements involve the payment to the landowner for a termination or extinguishment of a portion of his property rights." Comment, *Progress and Problems in Wisconsin's Scenic and Conservation Easement Program*, 1965 Wis. L.Rev. 352, 360 (1965) (quoted in *Hardesty v. State Roads Com. of State Highway Administration*, 276 Md. 25, 30, 343 A.2d 884 (1975)). "A 'negative easement' is a restrictive covenant." (Restatement (Third) of Property: Servitudes, § 1.3(3)).

8. Restrictive agreements or covenants "are a species of contract. Thus, they are interpreted in a like manner as other types of contracts." *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 682 n. 13, 922 A.2d 509 (2007).

nize the right of a third-party beneficiary to sue on a contract made expressly for the benefit of either a donee beneficiary or a creditor beneficiary. A third person is a donee beneficiary where it appears that the purpose of the promisee in obtaining the promise of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary. A third person is a creditor beneficiary where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations, or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds.... [But] before [such] a stranger to a contract can avail himself of the exceptional privilege of suing for a breach thereof, he must at least show that it was intended for his direct benefit.... In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.*, that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.

*Id.* at 56–58, 57 A.2d 318 (internal citations omitted). *See also CR–RSC Tower I, LLC v. RSC Tower I, LLC*, 202 Md.App. 307, 352–354, 32 A.3d 456, 483–484 (2011).

 "The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself." *Volcjak v. Washington County Hosp. Ass'n*, 124 Md.App. 481, 509, 723 A.2d 463 (1999). In some cases, the contract may clearly express an intended third party beneficiary, *see Schlicht v. Wengert*, 178 Md. 629, 634, 15 A.2d 911 (1940), but the absence of a clear expression is not necessarily decisive, for "[i]f the meaning of the instrument is not clear from its terms," *Belleview Constr. Co. v. Rugby Hall Community*

*Ass'n,* 321 Md. 152, 157, 582 A.2d 493 (1990) (emphasis added), "a party seeking enforcement [may] show an unexpressed intention by inference from ... the circumstances" surrounding the execution of the contract. *Schlicht* 178 Md. at 634, 15 A.2d 911. "Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question[.]" *City of Bowie v. MIE Props., Inc.,* 398 Md. 657, 681, 922 A.2d 509 (2007) (emphasis added). In such instances, extrinsic evidence "should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources." *Belleview,* 321 Md. at 157–158, 582 A.2d 493 (1990) (quoting *Baltimore Butchers Abattoir & Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 122, 17 A.2d 130 (1941)).[9]

"Construction of a contract is generally a matter of law for the court," [10] including "whether the parties intended a third party to have standing to enforce ... contractual provisions," *Volcjak v. Washington County Hosp. Ass'n,* 124 Md.App. 481, 509, 723 A.2d 463 (1999), although, technically, "[w]ho was intended to benefit from the covenant, with the correlative right to enforce the restrictions, presents a fact question which turns upon the intention of the original parties to the agreement." *First United Pentecostal Church v. Seibert,* 22 Md.App. 434, 440, 323 A.2d 668 (1974).[11]

Here, the Easement Agreement states that it is:

---

**9.** "This explication of the method of construing restrictive covenants has been accepted as the standard in Maryland." *City of Bowie,* 398 Md. at 680, 922 A.2d 509.

**10.** "Because this case involves a ... contract, it requires an interpretation of the relevant terms. In the first instance, absent any ambiguity, this involves a question of law for the court to resolve.... When the language of the contract is ambiguous, however, the ambiguity must be resolved by the trier of fact." *Nicholson Air Servs. v. Board of County Comm'rs,* 120 Md.App. 47, 63, 706 A.2d 124 (1998) (internal citations omitted).

**11.** Maryland's appellate courts have upheld a circuit court's determination of the intended beneficiaries to a contract at the summary judg-

by and between BELLEVALE FARM LIMITED PART-NERSHIP, a Maryland Limited Partnership, party of the first part, "Grantor", and the STATE OF MARYLAND, to the use of the Department of Agriculture on behalf of the Maryland Agricultural Land Preservation Foundation, party of the second part, "Grantee"....

Section B(5) of the Easement Agreement provides:

If the easement or any covenant, condition, limitation or restriction herein contained is violated or breached, the *Grantee* may after due notice to the Grantor, the Grantor's personal representatives, successors or assigns, institute an action in equity to enjoin, by *ex parte*, temporary or permanent injunction, such violation or breach; to require the restoration of the above described land to its condition prior to such other legal action as may be necessary to insure compliance with the easement and the covenants, conditions, limitations and restrictions herein contained.

(Emphasis added). Section B(7) further provides that "[t]his easement does not grant the public any right to access or any right of use of the ... land." Thus, the Easement Agreement clearly states that the State, as the grantee, may enforce the easement, and expressly limits public access and use of the land. There is no express statement in the Easement Agreement that others who have placed their property under MALPF easements, the general public, or adjoining property owners, are intended third-party beneficiaries to the Easement Agreement. There is also no mention of these parties, or of any of the claimed beneficiaries except as they are denied rights in § B(7). "[A]lthough it is not necessary to the creation of third-party beneficiary status that an intended beneficiary be specifically mentioned in the contract ... the lack of acknowledgment is certainly a factor to consider."

---

ment phase. *See, e.g., Volcjak,* 124 Md.App. 481, 723 A.2d 463. Moreover, appellants admit in their motions that "whether [appellants] have standing to bring this action" is, "[a]t this juncture," one of the issues "ripe for determination."

*Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 265, 969 A.2d 284 (2009).[12]

Appellants do not explain why it is not "clear from its terms" that it was the parties' intent that enforcement of the Easement Agreement lies solely with the State. They instead proceed *directly* to extrinsic evidence,[13] which we only consider if the intent of the parties and the purpose of the contract cannot be determined by the language of the Easement Agreement, to argue that they are intended beneficiaries of the easement. But, even if we assume that the intent of the parties is unclear and we consider the extrinsic evidence submitted by appellants, we are not persuaded that they are anything more than *incidental* beneficiaries of the Easement Agreement, and, as such, are not entitled to enforce the Easement Agreement. *See, e.g., Mackubin v. Curtiss–Wright Corp.*, 190 Md. 52, 57, 57 A.2d 318 (1948) (An incidental beneficiary may benefit from the contract, but it "acquires by virtue of the promise no right against the promisor or the promisee."). As explained in illustration 6 of the Restatement (Third) of Property: Servitudes, § 2.11,

A, B, and C are neighbors. A owns Blackacre, B owns Whiteacre, C owns Greenacre. A conveys Blackacre to D, subject to a covenant that D will maintain the landscaping on Blackacre so that it does not interfere with the view from Whiteacre. The deed states that the covenant runs with the land for the benefit of Whiteacre. Although Greenacre also enjoys a view across Blackacre, the holder of Greenacre is an incidental, not an intended, beneficiary of the servitude.

12. Appellees also argue, in the alternative, that pursuant to § 2–504(2)–(3) of the Agriculture article, only MALPF and/or the State is empowered to purchase easements under § 2–501 *et seq.* Thus, by limiting who may *acquire* such interests, they suggest that the legislature also intended to limit who may *enforce* them.

13. Appellants point to, among other sources, §§ 2–501 and 2–502 of the Agriculture article, COMAR 15.15.01.01, a fact sheet from MALPF's website, the Restatement (Third) of Property: Servitudes, § 8.5, and several law review articles.

Finally, relying on cases from other jurisdictions, appellants also argue that, *as a community association*, LGVA has standing to enforce the Easement Agreement as a conservation easement. *See Friends of the Shawangunks, Inc. v. Clark*, 585 F.Supp. 195, 199–200 (N.D.N.Y.1984), *rev'd on other grounds*, 754 F.2d 446 (2d Cir.1985) (organization with the mission to preserve the area in question had standing to enforce an existing conservation easement held by United States Department of the Interior under the Land and Water Conservation Fund Act of 1965); *Tenn. Envtl. Council, Inc. v. Bright Par 3 Assocs.*, 2004 WL 419720, 2004 Tenn.App. LEXIS 155 (Tenn.Ct.App. Mar. 8, 2004) (any citizen of Tennessee is a beneficiary of a conservation easement held by the City of Chattanooga pursuant to state law, and able to establish standing).

We, however, have found no Maryland authority, nor do appellants cite to any, to support the grant of standing to a community association that is not the intended beneficiary of the easement. "It has been generally recognized in this State that an association lacks standing to sue where it has no property interest of its own—separate and distinct from that of its individual members—which may be affected by any of the alleged acts under attack." *Citizens Planning & Housing Asso. v. County Executive of Baltimore County*, 273 Md. 333, 345, 329 A.2d 681 (1974); *see also Maryland Ass'n of HMOs v. Health Servs. Cost Review Comm'n*, 356 Md. 581, 589, 741 A.2d 483 (1999); Michael Sarbanes & Kathleen Skullney, *Taking Communities Seriously: Should Community Associations Have Standing in Maryland?*, 6 Md. J. Contemp. L. Issues 283 (1995).[14] We also note Bellevale's observation that, subsequent to the creation of the instant Easement Agree-

---

**14.** We are aware that the Court of Appeals has recently acknowledged that,

Section 5–204(f) of the Environment Article, enacted by Chapters 650 and 651 of the Maryland Laws of 2009 and effective January 1, 2010, enables a person to seek judicial review of an administrative determination by the Maryland Department of the Environment regarding certain environmental permits ... if the person satisfies the federal rubric for standing:

ment, it granted an easement identified as a conservation easement on a different part of its property, naming as grantees *both* MALPF and the Long Green Valley Conservancy, Inc., "a not for profit organization established to preserve farmland and the rural character of the Long Green Valley." [15]

## B. *Charitable Trust*

 Appellants also argue that, as a conservation easement, the Easement Agreement represents a charitable trust enforceable by "any interested person," and confers standing on both LGVA and the Yoders.

---

(f) *Judicial review of final determination by Department.*—A final determination by the Department on the issuance, denial, renewal, or revision of any permit under Title 5, Subtitle 5 or Subtitle 9, § 14–105, § 14–508, § 15–808, or § 16–307 of this article is subject to judicial review at the request of any person that:

(i) Meets the threshold standing requirements under federal law; and

(ii) 1. Is the applicant; or

2. Participated in a public participation process through the submission of written or oral comments, unless an opportunity for public participation was not provided.

*Patuxent Riverkeeper v. Md. Dep't of the Env't,* 422 Md. 294, 297–298, 29 A.3d 584, 586 (2011). *See id.* at 300, 29 A.3d 584 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("An environmental group can satisfy standing federally if 'its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' "). Appellants do not seek judicial review under § 5–204(f) of the Environment article. But, if a member of LGVA, such as the Yoders, has standing in its own right, we would not inquire into LGVA's standing.

15. A notarized and signed "Deed of Conservation Easement" is included in the record, which states,

> **THIS DEED OF CONSERVATION EASEMENT** ("Conservation Easement") made this 14th day of March 2002, by and between **BELLEVALE FARM LIMITED PARTNERSHIP,** a limited partnership, 4851 Long Green Road, Glen Arm MD 21257 ("Grantor"); and **LONG GREEN VALLEY CONSERVANCY, INC.,** P.O. Box 133, Long Green, MD 21092 and the **MARYLAND AGRICULTURAL LAND PRESERVATION FOUNDATION,** Maryland Department of Agriculture, State of Maryland, 50 Harry S. Truman Parkway, Annapolis, MD 21401 ("Grantees")[.]

Generally speaking, "[a] conservation easement is a legal agreement between a landowner and [a grantee] that restricts the potential uses of the land at issue in order to prevent it from being developed for commercial or industrial uses or for housing developments." *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 92 n. 1, 803 A.2d 512 (2002) (internal citations omitted). "Conservation easements-which are held by an individual or an entity-are easements in gross. A person need not own a particular piece of land to enjoy the benefit of a conservation easement." Matthew J. Richardson, Note, *Conservation Easements as Charitable Trusts in Kansas: Striking the Appropriate Balance Among the Grantor's Intent, the Public's Interest, and the Need for Flexibility,* 49 Washburn L.J. 175, 178 (2009). "Although not required by the easement enabling legislation in most states, the vast majority of conservation easements conveyed to date . . . were drafted to protect the particular land they encumber 'in perpetuity.' " Nancy A. McLaughlin, *Conservation Easements: Perpetuity and Beyond,* 34 Ecol. L.Q. 673, 675 (2007). Indeed, because "conservation easements are usually intended to last forever," they "are known as perpetual easements." *Id.* at 674.

In Maryland, § 2–118 of the Real Property article, entitled "Conservation easements; grants to certain trusts," governs conservation easements:

(a) *Creation and enforcement of conservation easements for certain purposes.*—Any restriction prohibiting or limiting the use of water or land areas, or any improvement or appurtenance thereto, for any of the purposes listed in subsection (b) of this section whether drafted in the form of an easement, covenant, restriction, or condition, creates an incorporeal property interest in the water or land areas, or the improvement or appurtenance thereto, so restricted, which is enforceable in both law and equity in the same manner as an easement or servitude with respect to the water or land areas, or the improvement or appurtenance thereto, if the restriction is executed in compliance with the

requirements of this article for the execution of deeds or the Estates and Trusts Article for the execution of wills.

Subsection (b)(8) includes "acts or uses having any relation to the preservation of water or land areas or the improvement or appurtenance thereto" as a proper purpose of a conservation easement.

The Maryland Environmental Trust (MET), which is governed under § 3–201 *et seq.* of the Natural Resources article, is, in Maryland, the "public agency that holds or co-holds most of the conservation easements in the State." Jessica E. Jay, *Third–Party Enforcement of Conservation Easements,* 29 Vt. L.Rev. 757, 773 (2005). *See Md. Envtl. Trust v. Gaynor,* 370 Md. 89, 92 n. 1, 803 A.2d 512 (2002) ("A conservation easement is a legal agreement between a landowner and MET[.]"). "[B]y accepting donated conservation easements . . . the State undertakes to enforce the restriction [in the easements] in perpetuity." *Id.* at 92, 803 A.2d 512.

Easements purchased by MALPF or the State for the benefit of MALPF under subtitle 5 of article 2 of the Agriculture article are described as "agricultural" or "agricultural preservation" easements, *see* MD. CODE ANN., AGRIC. § 2–510(k)(1) ("the Foundation shall notify in writing each landowner who sells an agricultural easement to the Foundation"); *Md. Agric. Land Pres. Found. v. Claggett,* 412 Md. 45, 52, 985 A.2d 565 (2009) (conveyance of "an agricultural preservation easement to the Foundation"), including in the Easement Agreement in the instant case. But MALPF also refers to them as "conservation" easements. *See* MALPF Five–Year Report for FY 2003 through FY 2007, Program Overview ("Including FY 2007 funds, MALPF has now cumulatively purchased or has a pending contract to purchase permanent conservation easements on 1,933 farms with 265,691 acres."); *see also supra* n. 15.

A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties in dealing with the property for the benefit of another person, which arises as a result of

a manifestation of an intention to create it." *From the Heart Church Ministries, Inc. v. Philadelphia–Baltimore Annual Conf.*, 184 Md.App. 11, 25, 964 A.2d 215 (2009) (quoting Restatement (Second) of Trusts, § 2). "The person who creates a trust is the settlor." *Id.* (quoting Restatement, § 3). "A *charitable* trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." *Rosser v. Prem*, 52 Md.App. 367, 374, 449 A.2d 461 (1982) (quoting Restatement, § 348) (emphasis added). "[R]ecognized as a vehicle to hold trust property for the general public's benefit," Jessica E. Jay, *Third–Party Enforcement of Conservation Easements*, 29 Vt. L.Rev. 757, 773 (2005), charitable trusts "should be liberally construed so as to give them effect if possible." *Rosser*, 52 Md.App. at 380 n. 13, 449 A.2d 461 (quoting *Baily v. McElroy*, 120 Ohio App. 85, 195 N.E.2d 559, 566 (1963)).

Between private trusts and charitable trusts,

[t]he fundamental distinction ... is that in the case of a private trust[,] property is devoted to the use of specified persons who are designated as beneficiaries of the trust; whereas in the case of a charitable trust[,] property is devoted to purposes beneficial to the community.... There cannot be a private trust unless there is a beneficiary who is definitely ascertained at the time of the creation of the trust or definitely ascertainable within the period of the rule against perpetuities. On the other hand, a charitable trust can be created although there is no definite or definitely ascertainably beneficiary designated, and a charitable trust is not invalid although by the terms of the trust it is to continue for an indefinite or unlimited period.

Restatement, Introductory Note to Chapter 11. *See also* Charles McHenry Howard, *Charitable Trusts in Maryland*, 1 Md. L.Rev. 105, 105 (1937) ("It is commonly said that charitable trusts have three leading and distinguishing features, viz: 1. They must be for the benefit of the public generally, or some considerable portion of it; 2. Their beneficiaries must

necessarily be indefinite; 3. Their duration is not restricted by the rule against perpetuities."). For example, "a bequest in trust to complete the education of a poor orphan, in whom the testator had a purely charitable interest, would be a good private trust and enforceable as such, [but] would not be a charitable trust under both the first and second requirements above stated." *Id.* at 106.

Sections 14–301 and 14–302 of the Estates and Trust article govern charitable trusts. Under § 14–301(a), "[c]ourts of equity have full jurisdiction to enforce trusts for charitable purposes upon suit of the State by the Attorney General or suit of *any person having an interest in enforcement of the trust.*" (Emphasis added). Section 14–302(a) provides,

[i]f a trust for charity is or becomes illegal, or impossible or impracticable of enforcement or if a devise or bequest for charity, at the time it was intended to become effective, is illegal, or impossible or impracticable of enforcement, and if the settlor or testator manifested a general intention to devote the property to charity, a court of equity, on application of any trustee, *or any interested person,* or the Attorney General of the State, may order an administration of the trust, devise or bequest as nearly as possible to fulfill the general charitable intention of the settlor or testator.

(Emphasis added).[16]

Section 2–118(e) of the Real Property article refers to both MALPF and § § 14–301 and 14–302 of the Estates and Trust article:

(e) *Grant to Maryland Agricultural Land Preservation Foundation, Maryland Historical Trust, or Maryland Environmental Trust.*—If any grant, reservation, dedication, devise, or gift of any nature which clearly indicates the

---

16. We note that appellants claim that the Yoders and LGVA are "interested" parties who may enforce the Easement Agreement as a charitable trust. As we shall explain, we do not reach the issue of whether appellants are "interested" parties, under §§ 14–301 and 14–302 of the Estates and Trust article, with standing to enforce the Easement Agreement as a charitable trust.

maker's intention to subject any interest or estate in property to public use for the preservation of agricultural, historic, or environmental qualities *fails to specify a grantee, donee, legatee, or beneficiary to receive the same or specifies a grantee, donee, legatee, or beneficiary who is not legally capable of taking the interest or estate,* it passes to the Maryland Agricultural Land Preservation Foundation, the Maryland Historical Trust, or the Maryland Environmental Trust in any proceedings under §§ 14–301 and 14–302 of the Estates and Trusts Article.[17]

(Emphasis added).

The application of charitable trust doctrine to conservation easements is still in its infancy, both nationwide and in Maryland. *See* Matthew J. Richardson, Note, *Conservation Easements as Charitable Trusts in Kansas: Striking the Appropriate Balance Among the Grantor's Intent, the Public's Interest, and the Need for Flexibility,* 49 Washburn L.J. 175, 188 (2009) ("case law dealing with conservation easements is sparse, and fewer cases specifically address whether such easements create charitable trusts"); Alexander R. Arpad, Comment, *Private Transactions, Public Benefits, and Perpetual Control Over the Use of Real Property: Interpreting Conservation Easements as Charitable Trusts,* 37 Real Prop. Prob. & Tr. J. 91, 94 (2002) ("The proposition that conservation easements may be interpreted as trusts is not entirely novel, but no serious attention has been given to trust law in the literature or the recorded cases on conservation easements.").

The application of trust law to conservation easements is "not beyond comprehension." Jessica E. Jay, *Third–Party*

---

**17.** Appellants do not posit that this case involves a "grant, reservation, dedication, devise, or gift of any nature which clearly indicates the maker's intention to subject any interest or estate in property to public use for the preservation of agricultural, historic, or environmental qualities," which "fails to specify a grantee, donee, legatee, or beneficiary to receive the same or specifies a grantee, donee, legatee, or beneficiary who is not legally capable of taking the interest or estate...."

*Enforcement of Conservation Easements,* 29 Vt. L.Rev. 757, 776 (2005). It

depends upon a state's specific public charity statutory or common laws involving charitable trust property, the grantor's intent, and the property subject to the trust. A simplified (perhaps overly so) analysis of the charitable trust doctrine could yield an argument that the doctrine potentially supports attorney general [or third-party] standing to enforce conservation easements when and if a conservation easement is characterized as property held in trust for the public's benefit, akin to any other property of a charitable trust. Extending the doctrine further, a conservation easement grantor's intent in perpetually protecting his or her property through use of a conservation easement would need to suffice as, or be substituted with, the trust creator's intent to create a charitable trust. Further, the land trust holding the conservation easement would have to fit the definition of a public charity or charitable trust in order for the analogy of a conservation easement donated by a property owner to a land trust to property placed in a charitable trust for the public's benefit to be viable.

*Id.* at 776–777.

The primary benefit of construing a conservation easement as a charitable trust is the doctrine of *cy pres,* which is "[o]ne of the unique features of the law of charitable trusts." Ronald R. Volkmer, *The Nebraska Uniform Trust Code: Nebraska Trust Law in Transition,* 37 Creighton L.Rev. 61, 79 (2003). Historically,

[u]nder this doctrine, if a donor showed a general intent to devote his gift to charitable purposes; and the gift failed because the specific purpose directed was too indefinite to be carried out, or was otherwise unenforceable; or if the trust while originally useful became subsequently impracticable for further administration ... the chancery court might direct the application of the charitable fund to some other purpose or purposes which it might determine to be 'near' (*pres* ) to the charitable purpose designated by the testator or founder.

Charles McHenry Howard, *Charitable Trusts in Maryland,* 1 Md. L.Rev. 105, 106–107 (1937).[18]

*Cy pres* would also require court approval to modify or terminate conservation easements:

> Because [a grantee] holds a ... perpetual conservation easement in trust for the benefit of the public, it should not be free to simply agree with the owner of the encumbered land to terminate the easement, or modify it in contravention of its purpose, even in exchange for cash or other compensation. Rather, to deviate from the stated purpose of the easement, either through outright termination or by substantially amending the easement, the municipality or land trust should be required to obtain court approval in a *cy pres* proceeding. In such a proceeding: (i) it would have to be established that the charitable purpose of the easement has become "impossible or impractical;" and (ii) if such a showing is made, the court would supervise the modification or termination of the easement, the payment of compensation to the holder equal to the value of the rights relinquished, and the holder's use of such compensation to accomplish similar conservation purposes in some other manner or location.

McLaughlin, 34 Ecol. L.Q. at 681.

In practice, *cy pres* could serve as a basis for extending standing where citizens who are not parties to an easement sue to enforce the easement. Matthew J. Richardson, Note, *Conservation Easements as Charitable Trusts in Kansas: Striking the Appropriate Balance Among the Grantor's Intent, the Public's Interest, and the Need for Flexibility,* 49 Washburn L.J. 175, 176 (2009)

---

**18.** Changing conditions that may make a charitable purpose impossible or impractical include "climate change or changes in the surrounding landscape that may degrade or destroy the conservation attributes for which the encumbered land was protected[.]" Nancy A. McLaughlin, *Conservation Easements: Perpetuity and Beyond,* 34 Ecol. L.Q. 673, 676 (2007).

Those who support treating conservation easements as charitable trusts argue,

> [c]onstruing conservation easements as charitable trusts ensures that both the trust settlor's intentions are honored and that the public's interest in the conservation easement is protected. Placing conservation easements within the framework of charitable trust law also allows courts to use cy pres to modify or terminate conservation easements that have become impracticable. Applying the doctrine of *cy pres* to conservation easements is a feasible solution to complaints that perpetual conservation easements are impractical, while court oversight protects the public's interest in conservation easements.

*Id.* at 192.

Nationwide, few cases have examined the application of the charitable trust doctrine to conservation or similar easements. In *Cohen v. Lynn*, 33 Mass.App.Ct. 271, 598 N.E.2d 682 (1992), two grantors conveyed a parcel of land to the City of Lynn to be used "forever for park purposes." *Id.* at 274, 598 N.E.2d 682. The City "appropriated $12,000 toward the $20,000 purchase price," and later leased the parcel to the Metropolitan Park Commission for 99 years for park purposes. *Id.* at 276, 598 N.E.2d 682. Upon the expiration of the lease, the City, claiming that the land was "no longer usable for park purposes," sold a portion of the land to a developer. *Id.* at 272, 598 N.E.2d 682. Under a Massachusetts law that granted taxpayers of the city standing to enforce the terms of a trust arising from a conveyance granted to the city, a group of taxpayers sought "a judgment declaring that the conveyance [to the developer] violated the city's obligations under a public charitable trust which they claimed arose in 1893 when the parcel was acquired by deeds which state that the land is to be used 'forever for park purposes.'" *Id.*

On appeal, the Appeals Court of Massachusetts held that the language "forever for park purposes," coupled with "[t]he circumstances attending the conveyances to the city[, which] evidence a general plan to dedicate the land permanently to

public park purposes," was sufficient to establish the grantors' intention to create a charitable trust, even though the grantors had received consideration for the easement. *Id.* at 275, 598 N.E.2d 682. The court observed, "[w]e have found no authority, nor is any cited to us, to the effect that the receipt of substantial consideration prevents a grantor from conveying property to a municipality in such manner as to establish a public charitable trust." *Id.* at 276, 598 N.E.2d 682.

In *Three Bills, Inc. v. City of Parma,* 111 Ohio App.3d 740, 676 N.E.2d 1273 (1996), a developer, as required by ordinance, "dedicated" a portion of land to the City for "parks and green area purposes." *Id.* at 743, 676 N.E.2d 1273. Later, the City leased the property to a broadcasting company, which built "a communications tower, service road, and maintenance building on the property." *Id.* The developer filed suit against the City and the broadcasting company "to restore the property to its previous condition and prohibit its use for commercial purposes." *Id.* "Assuming without deciding that a trust was created" by the dedication of the land, the Court of Appeals of Ohio held that the developer was without standing, because under Ohio case law, settlors and their successors could not sue to enforce a trust. *Id.* at 745, 676 N.E.2d 1273. The court noted that "[a] settlor within the meaning of the law of trusts is the person who creates the trust. Thus, for the purposes of this case, [the developer was] the settlor[ ] of a charitable trust." *Id.* The court also recognized that

> [t]he public, in as much as they are beneficiaries of charitable trusts, have a right to enforce their construction. In the same respect, adjacent property owners have a special interest, in as much as they are beneficiaries of restrictive covenants, which enable them to maintain an action to enjoin misuse of public lands. Nonetheless, [the developer] did not produce any evidence in the record proving they owned property in [the City], adjacent to the land in question or otherwise, nor did they even allege in the complaint that they owned property in [the City] . . . Accordingly, [the developer] lacks standing to enforce the construction of a

charitable trust and to enforce the terms of a restrictive covenant.

*Id.* at 745–46, 676 N.E.2d 1273.

In *Hicks ex rel. Bd. of Trs. of the Scenic Pres. Trust v. Dowd,* 157 P.3d 914 (Wy.2007), Lowham Limited Partnership owned a ranch in Johnson County, Wyoming. In 1993, it executed a "Deed of Conservation Easement and Quit Claim Deed" transferring one acre of the ranch to the Board of County Commissioners of Johnson County and imposing a conservation easement on the remainder of the ranch. The easement was to be in perpetuity unless "unforeseeable circumstances" rendered the continuation of the conversation easement impossible. In 1997, the Board quitclaimed the one-acre parcel to the Scenic Preserve Trust of Johnson County, "subject to any easements or rights-of-way that have been legally acquired."

Two years later, Lowham Limited Partnership sold the ranch subject to the conservation easement to the Dowds. Later,

[i]n 2001, coal bed methane development was contemplated by a company that owned mineral interests underlying [the r]anch. As a result, in June of 2002, the Dowds requested that the Board terminate the conservation easement. The Dowds asserted that coal bed methane development was unpreventable, unanticipated, and inconsistent with the terms of the conservation easement. The Dowds proposed that the conservation easement could be extinguished if the Board sold them the one-acre parcel and the conservation easement.

*Id.* at 917. The Board agreed that the proposed development was inconsistent with the purposes of the conservation easement, and transferred the one-acre tract and the conservation easement to the Dowds.

Hicks, a resident landowner in Johnson County, filed a complaint alleging that the easement "could not be extinguished until it was judicially determined that unforeseeable circumstances made the continuation of the easement impossi-

ble." *Id.* The Board and the Dowds moved for summary judgment, alleging that Hicks lacked standing to enforce the terms of the Scenic Preserve Trust. The trial court denied their motion for summary judgment, reasoning: (1) the conservation easement had been transferred to a charitable trust, the Scenic Preserve Trust, and (2) Hicks had standing because the easement was accepted for the benefit of Wyoming citizens.

On appeal, the Supreme Court of Wyoming stated that [i]n their brief, Appellants do not challenge the district court finding that the Scenic Preserve Trust is a charitable trust. Instead, they agree that the Scenic Preservation Trust is a charitable trust, whether under common law principles or under current statutory law. Given the district court's unchallenged finding, we must agree that the Scenic Preserve Trust is a charitable trust.

*Id.* at 919. The court found, however, that Hicks did not have standing because he was neither the Attorney General, a settlor, or a "qualified beneficiary" of the trust, as required under a Wyoming law.[19]

Our review of the reported case law[20] reveals that only *Hicks* involved a conservation easement, and, in that case, the

---

**19.** " 'Qualified beneficiary' means a beneficiary who is currently entitled to distributions of income or principal from the trust or has a vested remainder interest in the residuary of the trust which is not subject to divestment[.]" Wyo. Stat. § 4–10–103(a)(xv).

**20.** Implying that it has some binding effect on MALPF, appellants also refer us to *Attorney General v. Miller,* Civil Action No. 20–C–98–003486, 1998 WL 35318061 (Cir.Ct. for Talbot County, 1998) (the *"Myrtle Grove* case"), in which the Maryland Attorney General allegedly advocated a position on the charitable trust issue which is different from what they advocate here. Appellants do not actually argue that that case, which was settled by a consent judgment, and which involves different facts and substantially different parties, precludes MALPF—the only party common to that case and the instant case—from asserting an allegedly contradictory position here. That said, we do not believe that any form of estoppel would arise from that case. *See Colandrea v. Wilde Lake Community Ass'n,* 361 Md. 371, 761 A.2d 899 (2000) ("Collateral estoppel is concerned with the issue implications of the earlier litigation of a different case, while *res judicata* is concerned with the legal

appellate court was "constrained to agree that a charitable trust was involved because the trial court's finding on that point was never challenged by the parties." C. Timothy Lindstrom, *Conservation Easements, Common Sense and the Charitable Trust Doctrine,* 9 Wyo. L.Rev. 397, 405 (2009). *Three Bills* and *Cohen* involved conveyances and dedications, rather than easements, although "the courts' rationales and charitable trust analyses [may] illustrate how charitable trust law should govern conservation easements." Matthew J. Richardson, Note, *Conservation Easements as Charitable Trusts in Kansas: Striking the Appropriate Balance Among the Grantor's Intent, the Public's Interest, and the Need for Flexibility,* 49 Washburn L.J. 175, 192 (2009).

Based on the case law and the relevant statutory authority, and assuming, without deciding, that an agricultural preservation easement purchased by MALPF or the State for the benefit of MALPF qualifies as a "conservation easement," we are not persuaded that the charitable trust doctrine *must* be applied to purchased, nonperpetual agricultural preservation easements, nor even that it *should* be. We explain.

 In Maryland, the elements necessary to the creation of a charitable trust are: (1) a fiduciary relationship, (2) duties of trustees, (3) trust property, (4) manifestation of intention, and (5) a charitable purpose. *Rosser v. Prem,* 52 Md.App. 367, 377, 449 A.2d 461 (1982) (citing Restatement (Second) of Trusts, § 348).

As to elements (1)-(3), appellants contend:

consequences of a judgment entered earlier in the same cause. The two doctrines are based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised.") (citations omitted); *Underwood-Gary v. Mathews,* 366 Md. 660, 667, 785 A.2d 708 (2001) ("Judicial estoppel has been defined as a principle that precludes a party from taking a position in a subsequent action inconsistent with a position taken by him or her in a previous action."); *Alexander v. Walter,* 8 Gill 239 (Md.1849) (Under judicial estoppel, a verdict between parties could not be given in evidence in a later suit that involved a stranger to the first action).

These elements may be applied with little difficulty [to the Easement Agreement]. First, the conveyance of an agricultural preservation easement creates a fiduciary relationship because MALPF can be said to hold the property in trust for the benefit of the public, and owes an affirmative obligation to ensure that the land is used for the purposes specified in the easement and the law. Second, the Easement Agreement imposes duties on MALPF as trustee. Among other things, MALPF is charged with approving releases of lots from the easement, conducting inspections of the easement property, and enforcing the terms of the agreement. Third, there is trust property, of course, which is defined by property description in the Easement Agreement itself.

Elements (1)-(3) are not expressly disputed by the appellees.

As to the fourth element, "application of the charitable trust doctrine to conservation easements requires finding that the grantor of the easement intended to create such a trust in the first place." Lindstrom, 9 Wyo. L.Rev. at 402. *See also* Restatement, § 351 ("A charitable trust is created only if the settlor properly manifests an intention to create a charitable trust."). Comment b to § 351 recognizes that "[n]o particular form of words or conduct is necessary for the manifestation of intention to create a charitable trust. . . . A charitable trust may be created although the settlor does not use the word 'trust' or 'trustee.' " Appellants reference Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 2.8, at 50 (4th ed. 1989),[21] which states:

It is to be noticed that an express trust may arise even though the parties in their own minds did not intend to create a trust. . . . It is the manifestation of intention that controls and not the actual intention where that differs from the manifestation of intention. An express trust may be

---

21. This treatise has been described as a "leading treatise on trust law." Nancy A. McLaughlin and W. William Weeks, *In Defense of Conservation Easements: A Response to The End of Perpetuity*, 9 Wyo. L.Rev. 1, 21 (2009).

created even though the parties do not call it a trust, and even though they do not understand precisely what a trust is; it is sufficient if what they appear to have in mind is in its essentials what the courts mean when they speak of a trust.

Appellants argue that "[t]he Easement Agreement, the statutory scheme, and the MALPF program as a whole, all evidence the intent to create" a charitable trust. Here, the Easement Agreement states that it is "the intention of the parties that the said land shall be preserved solely for agricultural use in accordance with the provisions of the Agricultural Article," with no mention of "trust" or "trustee." Section B(5) of the Easement Agreement expressly provides that the grantee, *i.e.*, the State, "to the use of the Department of Agriculture on behalf of" MALPF, may enforce the easement; it does not state any other parties who may enforce the easement. *See supra.* We find the following admonition instructive:

[w]hether a conservation easement conveyance is intended by the grantor to create a charitable trust, . . . even though the deeds of conveyance typically do not contain the words "trust" or "trustee;" even though many easement donors may not know that the intended relationship is called a trust; . . . and even though creation of a charitable trust may add a dimension to the relationship between the landowner and easement holder that neither contemplated and that may substantially complicate that relationship; *is not something to be lightly inferred.*

Lindstrom, 9 Wyo. L.Rev. at 403 (citation and internal quotation marks omitted) (emphasis added).

First, negative easements or restrictive covenants are traditionally based on property law. *See id.* at 400; *see also* Jeffrey A. Blackie, Note, *Conservation Easements and the Doctrine of Changed Conditions,* 40 Hastings L.J. 1187, 1190 (1989) ("Conservation easements do not fit easily into any previously existing category of property interests"); Duncan M. Greene, Comment, *Dynamic Conservation Easements:*

*Facing the Problem of Perpetuity in Land Conservation*, 28 Seattle U.L.Rev. 883, 891 (2005). In addition, it can be argued that in the case of conservation easements, "grantors can reasonably assume that the easements they convey may be modified or terminated in the same manner as other easements, *i.e.*, if both parties to the easement agree," Lindstrom, 9 Wyo. L.Rev. at 404. Therefore, "[o]nly in the event of application of the charitable trust doctrine (or similar doctrines) to easement agreements are the parties precluded from jointly agreeing to amendments" to conservation easements. *Id.* at 408. In this case, the Easement Agreement expressly provides for modification or termination by agreement of the parties.

Second,

The course of action between landowners and easement holders belies any intent by either party to the easement that the easement conveyance was intended to create a charitable trust under which modification or termination was not a matter, *within the context of existing legal constraints*, solely within the purview of the landowner and the easement holder.

When a landowner conveys a conservation easement, and the holder accepts the easement, they do so subject to the existing law of the state of the conveyance. As a matter of law, those who enter into an agreement are charged with knowledge of and make their agreements subject to, existing law:

Parties to an agreement are presumed to know the law and to have contracted with reference to existing principles of law. These existing principles of law enter into and become a part of a contract as though referenced and incorporated into the terms of the agreement.

Lindstrom, 9 Wyo. L.Rev. at 403–04 (quoting 11 Williston On Contracts § 30:19 (4th ed.)) (other citations omitted) (emphasis in original).

Third, based on our analysis of the caselaw and the referenced scholarship, an important, if not primary rationale for

applying the charitable trust doctrine to conservation easements—to prevent termination or modification of an easement without court approval—has not been a great concern:

> In the over one hundred years of land trust history, with nearly 1,700 private land trusts now in business, and with over six million acres subject to thousands of privately held conservation easements, there *is only one recorded case of an improper conservation easement termination:* that of ... *Hicks v. Dowd.*

*Id.* at 401 (emphasis in original). This observation undermines the argument that, in regard to conservation easements,

> although municipalities and charitable organizations operate to benefit the public, history has shown that they cannot always be trusted to act in accordance with the public interest. Indeed, municipalities and charitable organizations entrusted with charitable assets will almost inevitably be subject to financial, political, and other pressures that could cause them to act in manners contrary to the public interest.

Nancy A. McLaughlin, *Conservation Easements: Perpetuity and Beyond,* 34 Ecol. L.Q. 673, 700–01 (2007).

Fourth, although the applicability of the charitable trust doctrine may encourage some landowners to convey conservation easements, it may discourage others, as we discuss in more detail below. *Compare id.* at 675 ("Indeed, the promise of permanent protection of cherished land has been a key selling point for land trusts attempting to convince private landowners to donate or sell conservation easements."), *and id.* at 702 ("Ad hoc, unsupervised modifications and termination of ostensibly 'perpetual' conservation easements would significantly undermine public confidence in the use of such easements as a land protection tool and chill future easement sales and donations."), *with* Lindstrom, 9 Wyo. L.Rev. at 410 ("[T]he unpredictable and potentially intrusive effect of application of the [charitable trust] doctrine to conservation easements is highly likely, once word gets around, to discourage many landowners from contributing them in the future.").

Fifth, the application of the charitable trust doctrine to a potentially *nonperpetual* conservation easement, such as the instant Easement Agreement, is particularly problematic, even among proponents of application generally. *See* McLaughlin, 34 Ecol. L.Q. at 707–712. Nonperpetual conservation easements include "easements that are drafted to endure indefinitely but expressly grant the holder some level of . . . discretion to simply agree with the owner of the encumbered land to substantially modify or terminate the easement." *Id.* at 707. We note that § 2–514.1, which was enacted by the General Assembly in 2004, states, "[a]n easement whose purchase is approved by the Board of Public Works on or after October 1, 2004, shall be held by the Foundation in perpetuity." [22]

Here, the Easement Agreement states that "[t]his easement shall be in perpetuity, *or for so long as profitable farming is feasible on the Grantor's land* and may be released only by the Grantee as provided by Agriculture Article, Section 2–514[.]" (Emphasis added). In pertinent part, § 2–514 states:

(a) *Legislative intent.*—It is the intent of the General Assembly that any easement whose purchase is approved by the Board of Public Works on or before September 30, 2004, be held by the Foundation for as long as profitable farming is feasible on the land under easement, and an easement may be terminated only in the manner and at the time specified in this section.

---

**22.** The floor report for House Bill 777 of the 2004 General Assembly, which amended § 2–514 and created § 2–514.1, states:

This bill requires an easement to be perpetual if its purchase by [MALPF] is approved by the Board of Public Works on or after October 1, 2004. . . . According to MALPF, the original intent when MALPF was established was that easements would be perpetual. The repurchase option was included to allow the possibility of exceptional circumstances when profitable farming would no longer be possible on a property and the repurchase of its easement restrictions would be consistent with local and State land-use objectives. MALPF advises that most land preservation programs in other states do not have a repurchase option and those that do make it extremely difficult for an easement to be repurchased. In addition, MALPF is the only state easement purchase program that does not have an explicitly perpetual easement.

(b) *Request for review.*—Except as provided in subsection (h) of this section, any time after 25 years from the date of purchase of an easement, the landowner may request that the easement be reviewed for possible termination of the easement. . . .

(f) *Repurchase by landowners.*—

(1) If the request for termination is approved, an appraisal of the subject land shall be ordered by the Foundation at the expense of the landowner requesting termination of the easement.

(2) (i) No more than 180 days following the appraisal required under paragraph (1) of this subsection, the landowner may repurchase the easement by paying to the Foundation the difference between the fair market value and the agricultural value of the subject land, as determined by the appraisal.

(ii) For purposes of this paragraph, the agricultural value of the land is determined by the appraisal method that was in effect at the time the easement was acquired by the Foundation, either by the agricultural appraisal formula under § 2–511(d) of this subtitle or by an appraisal that determines the price as of the valuation date which a vendor, willing but not obligated to sell, would accept, and which a purchaser, willing but not obligated to buy, would pay for a farm unit with land comparable in quality and composition to the property being appraised.

The Easement Agreement, which was executed in 1997, is potentially a terminable easement because § 2–514 provides an approach, after twenty-five years, for termination. In that situation, the Easement Agreement and the statute recognize that continuation of the Easement Agreement may become impracticable, and that a return to the pre-easement status is appropriate. Because of the flexibility built into the document and the legislation, there is no need to rely on *cy pres* and the charitable trust doctrine to react to a change of circumstances. *See* McLaughlin, 34 Ecol. L.Q. at 710.

Section 2–514's legislative history supports our analysis:

[i]t is recognized that, due to the voluntary nature of the easement purchase program, certain farms may be placed under easement only to find that, in the future, they are surrounded by development. This would place the owner in the awkward position of not being able to farm (because of "people pressure") and not being able to sell for another use (because of the easement). It is conceded that some relief should be available in these cases where the preservation effort has failed.

Senate Finance Committee Floor Report, S.B. 297, 6 (1977). But, "[i]n order to guard against abuse of the ability to terminate easements," § 2–514 "sets forth a rigorous procedure" for terminating easements. *Id.* at 7. This includes "an inquiry . . . conducted by the Foundation to determine the feasibility of profitable farming on the subject land," part of which is an "on-site inspection of the subject land" and "[a] public hearing;" the "approval of the governing body of the county maintaining the subject land;" the "affirmative vote of a majority of the Foundation members at-large, and . . . the approval of the Secretary and State Treasurer." MD. CODE ANN., AGRIC. § 2–514.

▇▇▇ There is also the question of whether the Easement Agreement reflects a charitable purpose. We may "consider the language of the instrument along with extrinsic evidence when divining whether a [settlor] has manifested a general charitable intent[.]" *Gallaudet Univ. v. National Soc'y of the Daughters of the Am. Revolution,* 117 Md.App. 171, 206, 699 A.2d 531 (1997). " 'Charitable purposes' includes all purposes within either the spirit or letter of the statute of 43 Elizabeth ch. 4 (1601), commonly known as the statute of charitable uses." MD. CODE ANN., EST. & TRUSTS § 14–301(b). Purposes within the statute of charitable uses are:

 (a) the relief of poverty;
 (b) the advancement of education;
 (c) the advancement of religion;
 (d) the promotion of health;
 (e) governmental or municipal purposes;

(f) other purposes the accomplishment of which is beneficial to the community.

*Rosser v. Prem,* 52 Md.App. 367, 374, 449 A.2d 461 (1982) (quoting Restatement (Second) of Trusts, § 368). "The word 'charity' has always been afforded a broad meaning in law. It includes 'substantially any scheme or effort to better the condition of society or any considerable part thereof.'" *Id.* at 380 n. 13, 449 A.2d 461 (quoting *Wilson v. First National Bank,* 164 Iowa 402, 145 N.W. 948, 952 (1914)).

Here, as in *Rosser,* whether Bellevale, as a settlor, "meant to create a charitable trust is not immediately apparent from the language of the [Easement Agreement] itself," but that is not necessarily dispositive. 52 Md.App. at 378, 449 A.2d 461.[23]

---

**23.** Nor does the legislation or its legislative history indicate what we might ordinarily consider a clear charitable purpose. Section 2–501 of the Agriculture article, which is titled "Legislative intent," provides,

(a) *In general.*—It is the intent of the Maryland General Assembly to preserve agricultural land and woodland in order to:

(1) Provide sources of agricultural products within the State for the citizens of the State;

(2) Control the urban expansion which is consuming the agricultural land and woodland of the State;

(3) Curb the spread of urban blight and deterioration; and

(4) Protect agricultural land and woodland as open-space land.

The importance of the economic contributions of farming was also a consideration in the adoption of the MALPF program. According to Craig A. Nielsen, *Preservation of Maryland Farmland: A Current Assessment,* 8 U. Balt. L.Rev. 429 (1979), which is cited in the "Notes" section of § 2–501,

[p]roponents of agricultural preservation in Maryland cite the significant contribution of agriculture to the state's economy as justification for the state's involvement in preservation. There has been much discussion ... concerning both the effect of agricultural land loss upon our economy and food supply, and the social implications of its conversion to residential use.

*Id.* at 432. Nielsen also states that

[f]arm owners also face new challenges, largely because counties adjoining Maryland's urban areas have adopted restrictive zoning in order to control costly development and to preserve agricultural land by limiting its development potential. Farm owners faced with this threat may be more inclined to participate in voluntary agricultural preservation programs by requesting the inclusion of their land in preservation districts, or by selling an easement to the state or local government for compensation.

*Id.* at 460.

Appellants contend that the "grant or donation of land to a governmental authority for a public purpose" reflects a charitable intent. They argue that

[t]he public purpose served by agricultural preservation easements is repeated throughout the statutory and regulatory scheme and promoted in MALPF's own literature— they preserve farmland as a food source for the citizenry, protect wildlife habitat and the water quality of the Chesapeake Bay, and they prohibit uses that are injurious to the environment and public health. Md.Code Ann., Agric. 2–501, –502; COMAR 15.15.01.01; (E. 94–104[, "MALPF's Five year Report for FY 2003 through FY 2007"]; E. 133–139[, MALPF Fact Sheets]; *see also* E. 279–313[, Senate Finance Committee Floor Report on S.B. 297]. Indeed, few programs are so completely infused with a public purpose and function, are so dedicated expressly to benefitting and protecting the public, and are so narrowly tailored to provide a public benefit in exchange for public cooperation and the payment of taxpayer dollars. *See id.; see also* E. 133, 96 (describing cooperative effort of State and citizens to "ensure future availability of agricultural land" and "increase the size of contiguous blocks of preserved farmland"; E. 98, 101 (MALPF program is primarily funded by the real estate transfer taxes that citizens pay to the State; in 2003, MALPF received 17.05% of the State's collected transfer taxes and two-thirds of the agricultural transfer taxes) *see also* Restatement (Third) of Trusts § 28(f) (the purposes of a charitable trust include "purposes that are beneficial to the community"); *id.* § 28 cmt. 1 ("[A] trust is charitable if its purpose is to promote ... environmental quality.... Thus, a trust to beautify a city or preserve the beauties of nature, or otherwise to add to the aesthetic enjoyment of the community, is charitable.").

MALPF counters that the State's purchase of the easement for $796,500 undermines appellants' position that this was a charitable donation that could give rise to a charitable trust. We see that appellants do not contend that the purchase price,

which is governed by § 2–511 of the Agriculture article,[24] was

24. Section 2–511 states:
 (a) *Maximum value.*—The maximum value of any easement to be purchased shall be the asking price or the difference between the fair market value of the land and the agricultural value of the land, whichever is lower.
 (b) *Fair market value.*—The fair market value of the land is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay for the property if the property was not subject to any restriction imposed under this subtitle.
 (c) *Agricultural value.*—The agricultural value of land is the price as of the valuation date which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay for the property as a farm unit, to be used for agricultural purposes.
 (d) *Determination of values.*—(1)(i) The value of the easement is determined at the time the Foundation is requested in writing to purchase the easement.
 (ii) The fair market value shall be determined by the Department of General Services based on one or more appraisals by the State appraisers, and appraisals, if any, of the landowner.
 (iii) The entire contiguous acreage shall be included in the determination of the value of the easement, less 1 acre per single dwelling; however, except as provided in § 2–513(b)(2) of this subtitle, the entire contiguous acreage, including the 1 acre per single dwelling, is subject to the easement restrictions.
 (2) (i) Subject to subparagraph (ii) of this paragraph, the agricultural value of land shall be determined by a formula approved by the Department that measures the farm productivity of the land on which the applicant has applied to sell an easement by taking into consideration weighted factors that may include rents, location, soil types, development pressure, interest rates, and potential agricultural use.
 (ii) The agricultural value determined under subparagraph (i) of this paragraph is subject to the approval of the Department.
 (e) *Arbitration.*—(1) If the landowner and Foundation do not agree on the value of the easement as determined by the State, either the landowner or the Foundation may request, no later than September 30 of the year following the determination of the value, that the matter be referred to the property tax assessment appeal board as provided under § 3–107 of the Tax–Property Article, for arbitration as to the value of the easement.
 (2) The value determined by that arbitration shall be binding upon the owner and the Foundation in a purchase of the easement made subsequent to the arbitration for a period of 2 years, unless the landowner and the Foundation agree upon a lesser value or the landowner or the Foundation appeals the results of the arbitration to the Maryland Tax Court, and either party may further appeal from the Tax Court as provided in § 13–532 of the Tax–General Article.

in some way artificially low so as to suggest a charitable intent.

"[T]he existence of consideration may make a court less likely to find an implied charitable trust to protect the intentions of the grantor." Alexander R. Arpad, Comment, *Private Transactions, Public Benefits, and Perpetual Control Over the Use of Real Property: Interpreting Conservation Easements as Charitable Trusts*, 37 Real Prop. Prob. & Tr. J. 91, 138–39 (2002). Perhaps it can be said that "[a] land trust that has paid market value for an easement should perhaps be entitled to a presumption that no additional trust duties are owed . . . ." *Id.* at 139. On the other hand, the existence of consideration did not prevent the Court of Appeals of Massachusetts from finding a charitable trust in *Cohen v. Lynn*, 33 Mass.App.Ct. 271, 276, 598 N.E.2d 682 (1992) ("We have found no authority, nor is any cited to us, to the effect that the receipt of substantial consideration prevents a grantor from conveying property to a municipality in such manner as to establish a public charitable trust."). Some commentators agree. *See* Matthew J. Richardson, Note, *Conservation Easements as Charitable Trusts in Kansas: Striking the Appropriate Balance Among the Grantor's Intent, the Public's Interest, and the Need for Flexibility*, 49 Washburn L.J. 175, 195 (2009) ("Applying charitable trust law to conservation easements protects the public's interest, which exists regardless of whether the easement was donated or purchased."). As one commentator has observed,

[o]ne reason the topic of consideration cannot be completely ignored here is that every conservation easement transaction has some element of consideration. Ordinarily, a donor wants to see the land protected in a particular way and receives a promise to that effect, if nothing else. In that sense, preservation of property through a conservation easement agreement can be seen as a joint venture. When both parties have made substantial contributions toward a mutual goal of preserving property, the intent of both parties is

presumably relevant to determining whether a trust has been established.

Arpad, 37 Real Prop. Prob. & Tr. J. at 139.

That said, we are not persuaded that the Easement Agreement before us reflects a "charitable purpose" or a charitable intent on the part of Bellevale. Not only was the MALPF program created in part for economic reasons, but the consideration paid by MALPF for the easement—$796,500—was obviously beneficial to Bellevale and the continuation of Bellevale's farming operation so long as it was practical to do so.[25] From the "settlor's" viewpoint, any benefit to the public was incidental.

In sum, this case involves a conservation easement purchased for what we understand to be the grantor's asking price, and which expressly provides that it may be terminated after twenty-five years upon satisfaction of certain conditions. We think it unnecessary to our result, and express no opinion as to how the principles generally applicable to charitable trusts would apply to expressly perpetual conservation easements conveyed in whole or in part as charitable gifts, or purchased under other statutes or provisions.

### C. Special Harm

██ Appellants argue that they have standing because the Yoders are neighbors to Bellevale Farm and also because some of LGVA's members reside in the area of Bellevale

---

25. Nor are we persuaded by appellants' claim that "grantors of easements under the MALPF program, like those who convey a conservation easement, are eligible for a federal charitable tax deduction so long as the easement is granted in perpetuity and for a 'conservation purpose.'" As we have explained previously, easements purchased by MALPF and/or the State before September 30, 2004 are potentially terminable after 25 years. *See* MD. CODE ANN., AGRIC. § 2–514. "A landowner donating a *nonperpetual* conservation easement would not be eligible for a federal charitable income tax deduction and could be liable for federal gift tax" under I.R.C. § 170(h). Nancy A. McLaughlin, *Conservation Easements: Perpetuity and Beyond,* 34 Ecol. L.Q. 673, 708 n.118 (2007) (emphasis added).

Farm. Thus, appellants will be "specially harmed" by the creamery operation in a manner different from the public.

In their response to MALPF's motion to dismiss and/or for summary judgment, appellants state that their "claims in the complaint are [not] based entirely on the October 23, 2007 decision to approve the Creamery Operation" or "any failure by MALPF to properly exercise discretionary authority under section 2–513(b)(1)(i)." In their reply brief, appellants characterize the allegation in their complaint that MALPF failed to enforce the Easement Agreement and violated the Easement Agreement and state and county laws as "illegal or *ultra vires* governmental actions."[26]

Appellants recognize that "[u]nder Maryland common law principles 'if an individual ... is seeking to redress a public wrong ... [that individual] has no standing in court unless [he or she] has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public.'" *120 W. Fayette St., LLLP v. Mayor of Baltimore*, 407 Md. 253, 270, 964 A.2d 662 (2009) (quoting *Medical Waste Assoc. v. Maryland Waste Coalition*, 327 Md. 596, 613, 612 A.2d 241 (1992)) (ellipses and brackets from *120 W. Fayette* ). This "aggrievement" requirement may be satisfied if one "can demonstrate that [a] land use decision will adversely affect his, her, or its interest, and that such interest is personal or specific, and not shared by

---

**26.** "In those circumstances where there is no statutory provision for judicial review ... the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, *illegal*, capricious or unreasonable," *Harvey v. Marshall*, 389 Md. 243, 275, 884 A.2d 1171 (2005) (quoting *Criminal Injuries Compensation Bd. v. Gould*, 273 Md. 486, 500–01, 331 A.2d 55 (1975)) (internal quotation marks omitted) (emphasis added), and also inaction. *Id.* at 276, 884 A.2d 1171. Courts exercise this inherent power

through the writ of mandamus, by injunction or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but in exercising that power, care must be taken not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion, where discretion is clearly conferred.

*Hecht v. Crook*, 184 Md. 271, 280–81, 40 A.2d 673 (1945).

the general public." *Id.* (quoting *Bryniarski v. Montgomery Co.,* 247 Md. 137, 144, 230 A.2d 289 (1967)).

Relying on *Sugarloaf Citizens' Ass'n v. Department of Env't,* 344 Md. 271, 686 A.2d 605 (1996) and *120 W. Fayette,*[27] appellants argue that the Yoders' status as neighboring property owners renders them *prima facie* "specially harmed," creating a rebuttable presumption of standing.

> In *Sugarloaf,* the dispute concerned
>
> the decision of the Maryland Department of the Environment (the Department) to issue two permits which authorized the construction of a solid waste incinerator near Sugarloaf Mountain in Dickerson, Maryland. A group comprised of local landowners, environmental organizations and citizens' groups challenged the Department's decision by filing in the Circuit Court for Montgomery County an action for judicial review under the Maryland Administrative Procedure Act, Maryland Code (1984, 1995 Repl.Vol.), § 10–222 of the State Government Article. The circuit court dismissed the action on the ground that none of the plaintiffs had standing to seek review of the Department's decision. The Court of Special Appeals affirmed.
>
> 344 Md. at 277, 686 A.2d 605. Recognizing that *Sugarloaf* was not a "typical zoning matter," *id.* at 298, 686 A.2d 605, the Court of Appeals held that
>
> [i]n actions for *judicial review* of administrative *land use* decisions, 'an adjoining, confronting or nearby property owner is deemed, *prima facie,* ... a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage ... and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved.'
>
> *Id.* at 297, 686 A.2d 605 (quoting *Bryniarski v. Montgomery County Bd. of Appeals,* 247 Md. 137, 145, 230 A.2d 289 (1967) (emphasis added)).

---

**27.** *120 W. Fayette* was filed on the same day as the motions hearing in the instant case.

Before turning to *120 W. Fayette,* we note that in *Bryniar-ski,*[28] which *Sugarloaf* cited extensively, the Court commented, immediately preceding the language quoted above by *Sugarloaf,* that:

1. There is a distinction between the degree of certainty of allegations and proof of aggrievement in cases in equity and in cases involving a petition for a writ of mandamus on one hand, and in statutory appeals from the board to the original court of record on the other.

(a) When the suit is in equity and a declaration nullifying a zoning ordinance for constitutional or other reasons is sought, the allegations by the plaintiff of how he is specially damaged by the zoning ordinance must be definite, and he must meet the burden of showing such special damage by competent evidence. *Richmark Realty Co., Inc. v. Whittlif,* 226 Md. 273, 282, 173 A.2d 196 (1961); *Loughborough v. Rivermass,* 213 Md. 239, 131 A.2d 461 (1957); *Cassell* [*Cassel*] *v. Mayor & C.C. of Baltimore,* 195 Md. 348, 73 A.2d 486 (1950); *Bauernschmidt v. Standard Oil Co.,* 153 Md. 647, 139 Atl. 531 (1927)

(b) In a mandamus action the same rule is applicable. *Lawler v. Bart Realty Corp.,* 241 Md. 405, 216 A.2d 729 (1966).

247 Md. at 144, 230 A.2d 289.

In *120 W. Fayette,* "[a]s a taxpayer and neighboring land-owner," 120 West Fayette filed a declaratory judgment action against the Mayor and City Council of Baltimore, alleging that a Land Disposition Agreement between the City and a developer made pursuant to a proposed urban renewal plan was

---

**28.** *Bryniarski* was a

zoning appeal involv[ing] the granting by the Montgomery County Board of Appeals (the Board) of the application of the Hillandale Medical Corporation for special exceptions to permit the construction and operation of an apartment hotel on 1.7697 acres of land zoned C–O (commercial-office), and for off-street parking, in conjunction with the apartment hotel use, on 4.1260 acres of adjoining land zoned R–90 (single-family residential).

247 Md. at 138, 230 A.2d 289.

*ultra vires* or illegal. 407 Md. at 259–60, 964 A.2d 662. In doing so, like appellants in this case, 120 West Fayette invoked the primary jurisdiction of the court. On appeal from a grant of summary judgment in favor of the Mayor and City, the Court opined that

> [b]ecause "land use . . . is at least one of the prime consider-ations with which an urban renewal plan is reasonably sure to be concerned," the principles[, as espoused in *Sugarloaf*,] that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging a munici-palities' allegedly illegal avoidance of urban renewal and procurement ordinances.

*Id.* at 272, 964 A.2d 662 (quoting *Master Royalties Corp. v. Baltimore*, 235 Md. 74, 92, 200 A.2d 652 (1964)). It concluded that, because "120 West Fayette's property is located in close proximity to the urban renewal area and . . . [b]ecause, 120 West Fayette has alleged that it will be able to both see and hear the allegedly illegal redevelopment of these properties from its doorsteps, it follows that 120 West Fayette will be directly impacted by and has a direct interest in the redevel-opment," and thus has standing. *Id.* at 272–73, 964 A.2d 662.

As observed by appellants, *Black's Law Dictionary* defines "land-use regulation" as "[a]n ordinance or other legislative enactment intended to govern the development of real estate." *Id.* at 884 (7th ed. 1999). Like the urban renewal plan in *120 W. Fayette*, "land use . . . is at least one of the prime considerations" in the legislative effort to preserve agriculture and woodland, and, in that sense, MALPF's approval of a proposed use of Bellevale Farm for a creamery operation is a land use decision. *Id.* at 272, 964 A.2d 662. Although not a traditional land-use regulation, the program provides a finan-cial incentive to landowners to voluntarily restrict their land to agricultural and woodland use rather than commercial, indus-trial, or residential use. *See* Craig A. Nielsen, *Preservation of Maryland Farmland: A Current Assessment*, 8 U. Balt. L.Rev. 429, 430 (1979) (MALPF "administers a voluntary

program for the purchase of development right easements from farm owners. The Foundation affords an opportunity for local governments to coordinate their *land-use* plans with each other and with the state in order to develop a workable comprehensive plan to promote the economic development of Maryland.") (emphasis added); *see also supra* n. 22 ("land-use objectives").

Based on *120 W. Fayette's* extension of the standing principles of *Sugarloaf* and *Bryniarski* beyond the judicial review arena, it appears that adjoining, confronting or neighboring property owners may have standing to challenge as an illegal or *ultra vires* action the approval of a proposed use of land subject to a MALPF easement.

Appellants, in their amended complaint, assert that the Yoders own property adjacent to Bellevale Farm and that "[appellants] will suffer irreparable harm if [appellees] are permitted to violate the Easement Agreement and the provisions of state and local law."[29] In their response to Bellevale's motion to dismiss and/or motion for summary judgment, appellants also state, in the context of their "intended beneficiaries" argument, that they have standing because the Yoders "own land adjacent to or nearby the easement property." In Bellevale's motion to dismiss and/or for summary judgment, it states that the Yoders are "neighbors." And in its answer to

---

**29.** Appellants did not allege in their complaint exactly how they would be adversely impacted by Bellevale's proposed development. In their briefs, they allege that they "will be the most impacted by the lack of open space and any development of this scenic and historic area," and raise concerns about "stormwater run-off and potential harm to the environment." It appears that the Yoders also operate a dairy operation. "But mere competition is not an evil which business men may enjoin as a wrong to them." *Cook v. Normac Corp.*, 176 Md. 394, 397, 4 A.2d 747 (1939); *see also Kreatchman v. Ramsburg*, 224 Md. 209, 222, 167 A.2d 345 (1961) ("the zoning laws give" a party "no standing to" enjoin another's use of land for shopping center purposes "where the sole basis for invoking them is the prevention of competition."); *Eastern Serv. Ctrs., Inc. v. Cloverland Dairy Farms, Inc.*, 130 Md.App. 1, 9, 744 A.2d 63 (2000) (dismissing appeal on ground that gas station company's sole motive in challenging the issuance of a zoning construction permit to another gas station company one block away was to prevent competition).

the amended complaint, MALPF admits that the Yoders own adjacent property.

Following the reasoning of *120 W. Fayette,* the Yoders would be considered *prima facie* aggrieved, and thus relieved of the burden of *alleging* specific harm. Once appellants alleged, uncontested, that the Yoders were adjacent and/or neighbors to Bellevale Farm, appellees, to challenge "the fact of aggrievement," had "the burden of denying such damage in [their] answer ... and of coming forward with evidence to rebut the presumption of aggrievement." *120 W. Fayette,* 407 Md. at 271, 964 A.2d 662 (citing *Sugarloaf,* 344 Md. at 297, 686 A.2d 605). In the circuit court, neither appellee denied that the Yoders will "suffer irreparable harm," or offered "persuasive evidence or argument indicating that [the Yoders] would not be impacted." *Id.* at 273, 964 A.2d 662.

Thus, we conclude that the circuit court, without the benefit of *120 W. Fayette,* erred in determining on summary judgment that the Yoders lacked neighbor property owner standing.[30] The circuit court, on remand, and after appellees have the opportunity to rebut any presumption of aggrievement, should reconsider the standing issue in light of *120 W. Fayette.*

### III. Exhaustion

In its brief, Bellevale avers that "[a]ppellants' lack of administrative success ... does not grant them any right to pursue their equitable claims that are the subject of this appeal, wherein they effectively seek the same relief from the

---

**30.** In *120 W. Fayette,* the Court of Appeals found both taxpayer and neighboring landowner standing. "Maryland law ... permits taxpayers to bring claims challenging alleged illegal or ultra vires acts of government officials." 407 Md. at 266, 964 A.2d 662. Here, appellants did not argue "taxpayer standing" before the circuit court as a basis for conferring standing, but mention it on appeal. "[T]he usual rule is that the appellate court will not consider arguments raised for the first time on appeal[.]" *Jones v. State,* 379 Md. 704, 735, 843 A.2d 778 (2004). We will not do so in this case.

Circuit Court in a new cause of action." We agree. But to the extent Bellevale is suggesting that the failure to proceed with judicial review in the Zoning Case was a failure to exhaust administrative remedies, we disagree.

As the United States Supreme Court explained in *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956),

[t]he doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

In our view, appellants did not fail to satisfy their administrative remedies simply because they were unsuccessful in the Zoning Case and did not pursue judicial review. In the Zoning Case, appellants filed a "Petition for Special Hearing" before the Deputy Zoning Commissioner for Baltimore County in order to determine "whether a dairy processing facility is permitted in an R.C.2 zone[.]" The Commissioner determined that the proposed creamery constituted a "farm" as defined in the Baltimore County Zoning Regulations. Here, the merits question is whether the proposed creamery qualifies as a "farm related use" under § 2–513 of the Agriculture article. While these questions may be *similar* and the answer the same in each, they are not the *same* question. As MALPF admits, "Bellevale Farm's development and zoning rights, which were already addressed at the Baltimore County admin-

istrative level, are totally separate from Appellee MALPF's permission for the proposed creamery at the Bellevale Farm under the MALPF Easement." It is possible, however, that some aspects of their aggrievement claims, *e.g.,* stormwater runoff or other environmental claims, may have been addressed in the prior administrative proceedings.

## CONCLUSION

Although we are not persuaded that appellants have standing under the third-party beneficiary or charitable trust theories, the Yoders, as neighbors to Bellevale Farm, are deemed to be *prima facie* aggrieved under the reasoning of *120 W. Fayette,* subject to appellees rebutting their aggrievement, and thus their standing, on remand.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**